Thank you counsel. Our next case is number 213954 AM Grand Court Lakes LLC v. Rockhill Insurance Company. Mr. Glatzer, I see that you reserved five minutes for rebuttal, is that correct? That's correct, your honor. You may begin. May it please the court, good morning your honors, I'm Phillip Glatzer for the appellant, Rockhill Insurance Company. As your honors know from the brief, this is a post-hurricane Irma property damage claim that was made against Rockhill by an assisted living facility up in North Miami Beach. And so after the hurricane, a claim was made for property damage and Rockhill did investigation, it sent people out there to take a look. Rockhill concluded that there was property damage, limited property damage, to the tune of a little bit under $250,000 and the deductible in the policy was $330,000, so Rockhill said we can't honor this claim because it's under the deductible. At that point suit gets filed, six weeks later suit is filed against Rockhill. Now what I've highlight in the briefs is this, I think dispositive fact, that the strategy of the plaintiff in the case was to try this case as a total loss of the assisted living facility, nothing less than a total loss. Why do I say that? Well first of all, an opening statement, counsel told the jury this is an agreed value policy and of course we know from the briefs that the value of the policy for this building was agreed to at $15.1 million. Once again, let's just switch over to closing argument now and then I'll get back to the trial evidence. In closing argument, counsel told the jury this is a top-to-bottom loss, the value of the policy is $15.1 million and that's what I the assisted living facility, $15.1 million, nothing less. As a matter of fact, your honors, during the trial, Judge Williams specifically asked trial counsel, are you asking for anything less than full value? He said no, I'm not, not going to ask for anything less and he didn't, he didn't. This is what happened during the trial, this is the focus of this appeal, is the trial evidence of damages. So there was one expert for the plaintiff, that was Mr. Gonzalez, he was a general contractor and he was the only one allowed to testify about the numbers. How much was this property damage worth? Mr. Gonzalez gave the jury one choice, full value, full demolition and rebuilding of the facility. He said this to the jury, this was the sum and substance of the damages, 165,000 square feet of the facility that was comprised of five buildings, as you know from the briefs, 165,000 square feet and my opinion is that it would cost between $315 and $400 per square foot to demolish and rebuild this facility. He then said, look, the rock bottom is $200 per square foot. Now, Mr. Gonzalez never did the math for the jury, he never said what $300 per square foot times 165,000 square feet would be or what 400 would be or what 200 would be, but we can do the math very easily, at $315 per square foot, that comes out to $51 million. At $400 per square foot, it comes out to $61 million. Can I ask you a quick question? Yes. If we agree with you that there's insufficient evidence, legally insufficient evidence to justify their number. Yes. What's the remedy? Do we reverse and render at zero, reverse and render at 235, reverse and render at 1.2, reverse and remand for further proceedings, like what do we do, Your Honor, based upon the evidence? There was one group of estimates unique to the roofs, not the buildings, not for demolition and rebuilding the buildings, that was a separate thing. On the roofs, the 235 fell under the deductible, that was Rock Hill's own estimate, so there would be no award there. The plaintiff had another estimate as if all the roofs had to be replaced on the five buildings, and that came in at $1.171,170,000. The jury could have awarded that higher estimate for the roofs. Why do I say that? There were bona fide estimates for the roofs. There were bona fide estimates for the roofs under the number that the plaintiff was asking for. That was the only lower number that the jury could have seized upon to render its verdict for total roof repair, and I would not be here today before you arguing if that's what the jury had done, because there were four roof estimates, and the jury was free to choose which one it believed. So does that mean the answer to my question is, well, there's an off-ramp here, and it's to reverse and render at 1.2 minus some change? Yes, that's possibility number one, and possibility number two, Your Honor, as I've said in the brief, is a new trial on the issue of damages with respect to the buildings, if that's where the court wants to go. Why do I say in the brief, and I'm going to say it here again on behalf of my client, why do I say that this $9 million number that the jury came up with, and it wasn't an even $9 million, it was $9,280,000. Where in the world did that come from? The plaintiff asked for anywhere between $51 and $60 million for a total redo. That would have triggered the full policy value of $15.1 million. The jury rejected that. Everybody knows that. The trial judge acknowledged that. The jury rejected the plaintiff's only theory of this case. I guess that's my question, though, because obviously I think you've criticized the idea that replacement value would have been appropriate, but that's not what the jury did. So, I mean, isn't it possible that perhaps some members of the jury thought that, you know, the full $50 or $60 or whatever it was was appropriate. Others thought that it was just a deductible case. Still others thought that the roofs were the appropriate measure of damage, and somehow those people in the room worked out as a compromise $9 million and change. And why? That would have been totally inappropriate, Your Honor, because there's no evidence to support that number. Why do I say that? There's no range, the only range was plaintiff said $51 million to $60 million. That would have triggered the $15.1 million limit of the policy. And so that we know that the jury rejected the theory of total demolition. So the jury could have awarded the highest estimate for the roof. For the roof, yes, we say that in the brief. But the jury couldn't just take out a Ouija board and come up with $9,280,000 because that was not a number that was anything that was presented by the plaintiff. I can see why that's unsatisfying, obviously, to your client. But I guess, do you have a case that tells us that the jury needs to pick a number that we can specifically identify where it came from? Yes, yes. Of course, the cases that we've cited in the brief is that, as this court has said, like in the Nebula case, that the verdict must be based upon reasonable certainty. I wouldn't be before you today if the plaintiff chose not to introduce any in-between evidence, no evidence of repairs. That's where they went. Every expert said, sorry, no repair estimate, no repair estimate, no repair estimate. Had the plaintiff come forward and said with evidence that said, you know, to repair this facility would be between $8 million and $10 million, then the $9,280,000 number would make some sense. Wasn't there evidence that the buildings would have to be replaced rather than repaired? And you argued that only one building was damaged. So what if you replace one building? Not the building, Your Honor, just the roof of one building at $249,000, not the building themselves. Right, but say there was also evidence that there was more damage than just the roof, regardless of what your position was. So what if the jury said, okay, one building was damaged, more than just the roof. It needs to be replaced at $300 to $400 a square foot or even $200. Then you get, by my calculation, based on the square footage, somewhere between $5.9 and $13.2 million. Couldn't the jury have done something like that? No, Your Honor, because that case was not presented to the jury. The evidence was that every single building is damaged exactly the same way. That was the plaintiff's evidence. Every demolished. The jury would not have been able to parse that out and say, well, we think only one building needed to be demolished. There was no evidence of that. It was all or nothing. Did your client, your client didn't suggest any difference in damage between the buildings? No, the only damage that my client was aware of, based upon its investigation, was damage to one part of one roof, not the buildings themselves. The client found zero damage to any of the buildings. I'd like to point out that in the answer brief, age 18 of the answer brief in this case, it is stated, and this is appropriate because it's true, that the plaintiff's entire case was total, it always was, total loss, nothing less than total loss. That was always the case. And the plaintiff made that decision, as plaintiff's lawyer told the trial judge, I'm not going to ask for anything less. There was no tools given to the jury upon which the jury could come up with this $9,280,000 verdict, except what happened at trial, and I'll get back to this in rebuttal, but what happened at trial is one of the witnesses testified that $9 million in renovations were put into that building. That was never part of the case. It's coincidental that that $9 million number is similar to what the jury's verdict was. It would have been completely improper, improper for the jury to base its verdict on that number for renovations at $9 million. One of the reasons is that we don't even know what that was for, that was never pointed out to the jury. We know it was bad renovations, for sure, because a lawsuit was filed because of these bad renovations, and that, of course, was before Hurricane Irma was even born. So that's one of the possibilities where that number came from, and it would have been improper for the jury to focus on that $9 million number. The only other possibility is that the jury sat around and speculated as to what a proper number would be in this case. But again, I want to emphasize that the range of damages that was So if there had been something else upon which the jury could have seized to come up with this $9,280,000, I probably would not be here today. What about the $1.2 million for the roofs? I have no problem with that, because that was an estimate that was in evidence that was the assisted living facilities estimate from five-star roofing for approximately $1.2 million. I have no quarrel with that. The jury could have awarded that as damages, and I wouldn't be standing here before you today if that's what had happened, but that's not what happened. This number came, I hate to use cliches, it came out of thin air. It was pulled out of a hat. I mean, this number, like I said before, the jury may have taken out a Ouija board and said, spirits, what's a good number in this case? Because we don't want to award 30 million or 50 million or 60 million or the policy limit of 15.1 million. It's a number that makes no sense based upon this evidence. And based upon that, I asked the court, Judge Newsom, you asked for my suggestions here. The court can award the highest estimate for the roofs, that's a possibility, or remand for a new trial on the issue of damages, because something went terribly wrong here, and it really would be a miscarriage of justice for this verdict to stand. It's excessive. Mr. Glasser, you're well into your, you're going to be eating into your rebuttal time if you don't conclude. Yes, thank you. Mr. Alexander. Good morning, Your Honors. May it please the court. My name is Sam Alexander, and I represent the Appalachian Grant. The trial court did not abuse its discretion in denying Rock Hills motions from new trial for two reasons. First, the verdict in this case was not speculative because there was a reasonable basis in the evidence from which the jury could calculate its damages. So what was the reasonable basis for the 9.28 million? Well, Mr. Gonzalez testified that the replacement cost of the property would be between $315 and $400 per square foot, generally for an assisted living facility, $400 per square foot being at the high-end modern federal assisted living facility. When asked at trial, you know, what's the bare minimum, he said it couldn't be done for under $200 per square foot. The jury was given the numerous engineering reports. Hold on. So do the math for me. Where does Gonzalez land? I didn't think Gonzalez testified to anything about $9 million, anything. I thought he did his $60 million. So the case, the plaintiff's case was that the entire structure needed to be torn down and rebuilt. Yeah. So you said there was evidence from which a reasonable estimate the jury could come up with the 9.28 number. I'm just asking what that evidence is. The square footage times what? Times a price per square foot. And who gave that price per square foot other than Gonzalez? Well, he takes you to $50 or $60 million. I'm interested in what gets you to 9.28. Well, he gave a price per square foot. So his $50 or $60 million total came from his application of his price per square foot to the amount that they claimed was damaged. Yeah. So maybe I'm just being completely dense here, but I just don't understand how you can, how the multiplication is working here. We know what the square footage is. We know what his price per square foot is. We know that his math gets into $50 or $60 million. You say there's evidence from which a jury could conclude 9.28 or 8.2 or whatever it is. And what's that? They decided that a different square footage of the building needed to be replaced. And what was the evidence on which they could have concluded that part of the building needed to be replaced, but not all of it? So they had over a thousand photographs of the buildings, details of the insides of the rooms, the roofs. They had hundreds of pictures of moisture meter readings of the roofs, moisture meetings of the internals of the buildings, all over the buildings, all over the units, pictures of the concrete cracking, the rebar. The jury could have viewed this evidence and thought, well, we agree with Mr. Gonzalez and the experts that building, let's say A needs to be replaced and building A is 27,000 square feet. And at $339 per square foot, that comes out to $9.28 million. Was there any suggestion by your client that the buildings were damaged in different ways or was the evidence that they were all similarly damaged? The evidence was that they were all similarly damaged and the jury rejected that. Maybe this is another stupid question, but is that the sort of thing, degree of damage requiring replacement versus repair, is that the sort of thing that you would need expert testimony for? Or can a jury just kind of eyeball a photo and be like, no, you can fix that, but you're going to have to replace that one. So there was no evidence whatsoever on repair costs. So our position is that if there was a determination that there needed to be a repair to something aside from the roofs, that there was simply no evidence on that. The jury was instructed to base their evidence, their verdict on the evidence that they were given. So we think that their verdict must be limited to replacement costs, which is why we have... So in one of... Does that mean from the photos and the engineering reports, it wasn't necessarily a mix of replacement and repair, but a mix of replacement and nothing, replacement and just live with it? Correct. Because there was no evidence of repair costs. So it would have to have... If the evidence supported the verdict, it would have to have been because the jury concluded that certain buildings or one building needed to be replaced, but not the others. Is that your position? Yes. Did the insurance company put forward any evidence that, okay, well, maybe this building needs repairs, but not these other ones? The insurance company's position was that there was minor damage to one of the roofs, and they did not... They didn't differentiate other than that between the buildings? No. So the jury had access to various different ways to calculate the square footages of the buildings. The five star estimate, I think, is the clearest. It shows the length and width of the buildings in a very short period of time. If they decided that building A1 needed to be replaced at $339 per square foot, that's $9.28 million. If they decided that building B needed to be replaced at 38,000 square feet, that's $242 per square foot. If they decided that A1 and A2 needed to be replaced at $211 per square foot, that'd be $9.28 million. I find it somewhat curious that your client put forward evidence that you needed 50 or $60 million to rebuild everything, but obviously you're defending the $9 million verdict. That's a pretty big delta between those figures, isn't it? Yes, definitely. We would have much preferred... I bet. But so, I mean, it's an issue of fact for the jury, and both sides made their case. I mean, they argued that there was basically no damage at all, and the plaintiff argued that the entire structure needed to be torn down from top to bottom. The jury spent five hours. They listened to all the testimony over five days. They looked through all the evidence. They looked through the engineering reports. They looked at the pictures. They looked at the moisture meter readings, and they came to a conclusion that $9.28 million was the amount that would compensate A.M. Grand for Rockhill's breach of the policy. Do you think that a compromise would be lawful, the hypothetical that I outlined where a few jury members thought that there was roof damage, maybe one thought there was nothing, and others thought that it was full replacement costs for all of the buildings? Do you think it would have been lawful for them to reach $9.2 million as a compromise verdict? Candidly, I have not researched that issue, but there's just... It's our opinion. There's simply no evidence that that occurred. In order to make a determination that the jury speculated in this case requires, in effect, speculation that they considered some sort of evidence that they were not permitted to consider. There's so many different ways that the jury could get to $9.28 million based on the square footages of these individual buildings. Is it your contention then, I guess, that once you posted Gonzalez's $50 to $60 million number, anything south of that, given the photos and the engineering reports, was going to be fair? Because they could have sort of sliced and diced that evidence however they wanted to. Yes. And that is their role in this. They were given the price per square foot for rebuild, and they were given the square footages of the buildings, and they determined in their opinion what the amount was going to be required to rebuild the property that they thought needed to be rebuilt. Despite, I guess, the fact that neither... And maybe this isn't required, but that neither party here, it sounds like, led the jury in its presentation of the evidence, its argument or otherwise, to think that there was some kind of halfway measure here. They basically say nothing but the roof. You say everything. But now, having posted the $50 to $60 million with all of these photographs and engineering reports, the jury can do no wrong. Without some sort of evidence that they considered improper factors, in effect, that's the case. The Sullivan case, this court's decision in Sullivan, holds that there's a wide range of damages shown in the evidence at trial. The jury enjoys substantial discretion in selecting a damages amount between those two extremes. And in this case, Rockhill would effectively need to prove that the jury breached their verdict through some sort of impermissible method. And that's why the majority of their appellant's initial brief focuses on the Migaldi District Court order, where they say, well, there's this law in Florida that jury was never instructed on it, but they should be held to that standard now, which says that a jury's not permitted to find that a building can be partially demolished in the absence of some sort of government demolition order. What about just sort of generic damages proof law that says, you know, that the jury at least have, that there has to be some basis in, you know, in reasonable certainty that the jury, like, sort of came to the right number? I guess I'm just a little concerned that you can post this big number and then just kind of, like, let the chips fall where they may. Anything south of that is reasonable certainty. I mean, what that means is that there is a $60 million range here, or almost $60 million, from almost nothing to $60 million, without any sort of affirmative presentation that would qualify as reasonable certainty. There, I would disagree with that characterization, because there is reasonable certainty in the evidence. And I would, just to frame the issue, I would like to bring to the Court's attention that the question of speculative damages generally is a question of the evidence of proof of damages and not, doesn't apply as strongly to a jury's determination of an amount of damages. And so the case law, whether it's Florida, whether it's this Court or the Florida Supreme Court, holds that once damages have been shown, an approximate measure of damage is not impermissible. It's not necessarily speculative just because it's difficult to arrive at that amount. But there's, am I wrong? Maybe I'm just wrong about this. Just so the reason, you're telling me reasonable certainty applies only to the fact of damages, not the amount at all. No, no, no, no. Reasonable certainty applies to the verdict itself. The number. Yes. Okay. But in terms of the general rule that damages cannot be speculative, generally that's held to a much stricter standard when you're talking about the evidence adduced at trial rather than the jury's verdict itself. And so in this case, this is not a case where there was evidence of a $50 to $60 million damage and evidence of a $235,000 amount of damage, and there was simply nothing in between. And so anything in between is fair game. There was evidence of a price per lower levels of damages. And the plaintiff said, here's the amount of this building that we think has been, needs to be replaced, which is the entire thing. And the jury disagreed with that. And they applied a logical calculation. They determined based on the quality of the building, what price per square foot they thought was fair. They analyzed the evidence. They looked at the pictures. They listened to the testimony. They determined what part, what portion of the building they thought needed to be replaced, and that's how they came to their number. There's no evidence they did anything other than that. Can I ask you one other question about the Gonzalez estimate, the price per square foot estimate? Did he provide hard data to support that estimate, or was it just kind of a say-so? So it was based on his experience 20 years as a contractor and a assisted living facility for the federal government, the Articopos facility. And that was, I believe, 125,000 square feet. And the budget was $50 million, which was $400 per square foot. And so that represented, in his mind, the top of the line, brand new federal standard. And he said at the low end of an assisted facility, living facility, which he had constructed in the $15 per square foot. I think it's also important to note that these arguments were not preserved. Just dealing with the motion for judgment as a matter of law, they've conceded on appeal that the jury could have reached a verdict in favor of A.M. Grand. So our position is that means that that precludes a motion for judgment as a matter of law. With regard to the speculative damages argument, their argument in their brief was that the jury was not permitted to select certain of the buildings for replacement because under Florida's valued policy law, you require a government demolition order in order to do that. There's no indication. First of all, they never made that argument below. The jury was never the law. I mean, they've conceded that that chapter and that statute does not apply in this case. They're requesting that this court basically adopt the reasoning behind the law. It's far too late for that. And the argument was never made below. On the excessive damages argument, the trial court found that Rockhill's argument was conclusory and that it simply recited the factors a Florida court must consider when determining excessiveness, but never actually applied them to the facts of the case. So are there any other questions I can assist the court within its analysis? We respectfully request that this court affirm the trial court's well-reasoned exercise of its discretion in affirming the jury's verdict. Thank you, Your Honor. Your Honor, I would like to, if I may, read just one sentence from the Appley's brief, page 18, right around the middle of the page. Total loss was the basis of Amgran's entire case. Total loss was the basis of Amgran's entire case. Why am I emphasizing that? Because Amgran, at trial, the strategy was not to parse out the buildings, not to parse out the damages. It was just total loss. Judge Grant, you asked a very good question. Was there any difference in the various buildings? Absolutely not. The evidence was that, according to, Rockhill doesn't agree with it, but the evidence was from the experts for Amgran, every building was damaged exactly the same way. It was pervasive. It was every building. So could the jury, Judge Pryor, you asked this, have sat down and said, well, why don't we pick building A or building D and then multiply the square footage? The answer is no. There was no reasonable evidence to allow that. I thought you argued, though, that only building D was damaged in the hurricane. Not the building, Your Honor. Not the building. Just a portion of the roof on building D. And that fell under the deductible. Not the building itself. Rockhill's experts found no damage to the buildings. It only found damage to a portion of the roof on building D. May I also... But there was evidence from the other side that building D, as well as the other buildings, suffered more damage than that. Oh, yes. That's what they needed to be replaced. Absolutely. The evidence from the other side was every single building needed to be demolished. Not singling out one building as needed to be demolished less than the other building. They all needed to be demolished. So there was no way for the jury to sit back and say, oh, let's... Now, let's talk about the photos. There isn't a single photo in this case which would have allowed the jury to differentiate between the buildings. As counsel said, yes, there were a thousand photos. There were hundreds and hundreds of photos of a meter. There's no way that a jury could look at a photo of a meter and come up with a dollar sign in its head. And if there were any photos that would allow the jury to do that, why weren't they included as an example in the supplemental appendix that was filed to show the court, oh, look at these photos. You see? The jury could have looked at this photo and said, well, building A looks okay to me, but there aren't any such photos. They don't exist. Is that the... Again, I just don't know. Is that the sort of thing with respect to which expert testimony would be required or could, theoretically, lay jurors shuffle through photos and engineering reports and decide? Expert testimony would have been required for that, Judge, because every expert said that every building was identical as far as damages are concerned. It was pervasive. Every single building was damaged to the same extent. So there would have had to be some expert testimony saying, well, no, building A wasn't that damaged. There's a practical reason why there couldn't be parsing out of the buildings, and that's why the plaintiff didn't do it. These buildings are all connected. They're all connected. There would be no way to demolish building C only or building A only. They were connected. The five buildings in a row connected by catwalks. So that's the reason that the plaintiff didn't parse out the damages here, because it had to be, according to the plaintiff, all or nothing, or the alternative would have been repair, something less than total demolition. And this troubled the trial judge all through the trial. The trial judge first said she was not going to let Mr. Gonzalez testify. She said, he can't come in here and go from zero to 60 in 60 seconds. I won't allow it. He will not testify in my courtroom. And then the next day, the trial judge changed her mind. And then after he testified, the judge was very concerned about that. She said, you know, I still think a piece of the plaintiff's case is missing. And what was missing was any evidence of repair. They chose not to do it. They chose not to give the jury a basis for finding a lower number. All they wanted was the full amount of the policy wasn't wasn't the issue. What was damaged by the hurricane? I mean, clearly, there were pictures of some kind of damage to all the buildings. And you argued only one building's roof was damaged by the hurricane. Yes, Your Honor. And as a matter of fact, Mr. Gonzalez said he couldn't even tell what damages were caused by Hurricane Irma. I cited that in the brief. He said, as I sit here today, I can't tell you what part of my estimate is due to Hurricane Irma. Okay. And the plaintiff's argument, I'm assuming, is that the rain came down through the damaged roofs that were damaged by the hurricane and then damaged the buildings. Damaged all the buildings, such that they were a constructive total loss. And that was the it is of that case. Yes. The plaintiff was still, this is a dispositive, I believe, still making the case to the trial court in his motion for entry of judgment in favor of Anne Graham. What amount did the plaintiff ask for in the motion for entry of judgment? Did he ask for the nine point two eight million dollars so that he was accepting partial demolition? No. The number that the plaintiff asked for in his motion for entry of judgment was fifteen point one million dollars. This is what the plaintiff told the court. I think we've got your argument, Mr. Glass. Okay. All right, Your Honor. My time's up and thank you for your attention.